# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | **Cr. No. 04-216-01-SM** |
| ) | |
| **v.** ) | |
| ) | |
| **JAMES TOBIN,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## GOVERNMENT'S OBJECTION TO DEFENDANT'S
## MOTION FOR A JUDGMENT OF ACQUITTAL (Docket Nos. 164 and 167)

The United States of America, by its undersigned attorneys, objects to Motion of

Defendant James Tobin to Motion For A Judgment of Acquittal (Docket Nos. 164 and 167).

Tobin has not shown that he is entitled to requested relief, and the motion should be denied.

A district court's power to set aside a jury verdict is "very circumscribed." *United States*

*v. Rothrock*, 806 F.2d 318, 320 (1st Cir. 1986). It is "duty-bound to construe the evidence,

together with all legitimate inferences to be drawn therefrom, in the light most favorable to the

government." *Id. See also United States v. Olbres*, 61 F.3d 967, 975 (1st Cir. 1995) ("[i]t is trite,

but true, that a [district] court ought not disturb, on the ground of insufficient evidence, a jury

verdict that is supported by a plausible rendition of the record") (citations, quotations omitted).

## I.     THE FORMATION OF THE CONSPIRACY DID NOT "POST-DATE" TOBIN'S INVOLVEMENT WITH CHARLES McGEE AND ALLEN RAYMOND

Tobin contends that any agreement to commit a crime post-dated his involvement with

Charles McGee and Allen Raymond. At bottom, he argues that the conspiracy was conditional

until certain issues had been resolved.  Tobin disregards the well-settled principle that "[e]very

conspiracy is conditional to some extent, for no one agrees to go through with an agreement no

matter what.  Conditions, express or implied, do not make a contract unenforceable; they merely

define the circumstances in which a party can avoid having to perform his contractual obligation;

they presuppose rather than nullify the obligation."  *United States v. Podolsky*, 798 F.2d 177, 178

(7th Cir. 1986) (emphasis added), cited approvingly in *United States v. Palmer*, 203 F.3d 55, 64

(1st Cir.  2000).  In light of this, there was more than sufficient evidence to support Tobin's

conviction on Count 2.

Charles McGee, then Executive Director of the New Hampshire Republican State

Committee, told Tobin that the essence of the scheme was disrupting phone lines by making

telephone calls (12/6/05 Tr. 87).  McGee also gave Tobin information on exactly the kind of

vendor – "[p]eople who make calls for whatever reason" (12/7/05 AM Tr. 53) -- he was looking

for to accomplish the scheme.

> 3  I remember telling Mr. Tobin the name of the
> 4  vendors that I had previously tried.  I testified
> 5  yesterday that I tried two or three vendors, and this
> 6  was all my idea.  And so when I talked to Mr. Tobin
> 7  about this, I didn't want him to give me the same
> 8  vendors back because I already knew them.  I was looking
> 9  for somebody different.  And so I believe I told Mr.
> 10  Tobin the general gist or the general idea of the plans
> 11  to disrupt phone lines for the democrats.

12/7/05 AM Tr. 26.  McGee averred that the scheme would have died on the vine had Tobin told

him to stop it.  12/6/05 Tr. 88-89 ("I would not have proceeded").  And then:

> 3    Q.  Now, given what Mr. Tobin did, what, in fact,
> 4  did you go ahead and do?
> 5    A.  I called Mr. Raymond.

2

*Id*. at 89-90.    When he called Allen Raymond – with whom he had never before spoken – McGee explained "that Jim gave me his number and [I] basically laid out to him my idea," i.e., tying up phone lines.  *Id*. at 90.   Based on this testimony alone, there was sufficient evidence for the jury to find that Tobin understood the general nature of the scheme and became part of it by arranging the criminal marriage of McGee and Raymond.

Allen Raymond confirmed McGee's testimony, testifying that Tobin called him and "detailed to me a phone program which involved conceptually jamming Get-Out-The-Vote phone calls made by the democratic party . . . ."   12/7/05 AM Tr. at 85.  The two discussed how this might be accomplished.  Raymond cited "an example of inadvertent phone jamming . . . .  So my point there is that if it can be done inadvertently, it can be done intentionally, and then I tell him that we can do it, that anything is possible."  *Id*. at 86. The scenario described above was "an anonymous [call] scenario," with recipients not being told who was calling or why.  12/7/05 PM Tr. at 60-61.   Tobin "expressly" instructed Raymond to wait for a call from Charles McGee. 12/7/05 AM Tr. 87.

Tobin and Raymond spoke again during the late afternoon of Election Day 2002.  They discussed why the phone jamming scheme had been stopped by John Dowd.  12/7/05 AM Tr. at 103-104.  They spoke again the following day, and at that time Tobin told Raymond that the check Raymond had received had been "forged."  Page 107-109.  Tobin and Raymond spoke one last time later in November 2002, after Raymond had been contacted by the Manchester police. Tobin at first "pretend[ed] not to remember the program at all," responding to Raymond by with a false denial of knowledge:  "What are you talking about?"  But Tobin ultimately abandoned the charade.  12/7/05 AM Tr. 108-109.

Tobin argues that there was no agreement in this case.  However, an express agreement akin to a legal contract need not be proven.  The agreement may be "tacit" or implied, rather than express, and may be inferred from circumstantial evidence such as "an implicit working relationship" or "a development and collocation of circumstances."  *See United States v. Patrick*, 248 F.3d 11, 20 (1st Cir. 2001); *United States v. Barnes*, 244 F.3d 172, 175 (1st Cir. 2001); *United States v. Rivera*, 781 F.2d 229, 234 (1st Cir. 1985).  Furthermore, the government need not show that the conspirators "worked out all the details" of their criminal conduct; a "general understanding" of the conduct and its objectives will suffice.  First Circuit Pattern Jury Instruction § 4.03.

Based on the above, there was ample evidence from which the jury could find that Tobin conspired with Raymond and McGee.  Once Tobin had spoken with McGee and Raymond, he and they shared a "general understanding" of how the scheme would proceed.  Based on his conversation with McGee, Tobin knew that the purpose of the scheme was to disrupt telephone lines by making repeated phone calls.  And when Tobin spoke with Raymond, that is the scenario they discussed.  Finally, as an official of the National Republican Senatorial Committee, whose purpose was to work on the election of Republican U.S. Senate candidates (12/7/05 AM Tr. 71), Tobin surely had a strong interest in the outcome of the 2002 senatorial election in New Hampshire.

Tobin asserts that even after his conversations with McGee and Raymond, there remained many details to be worked out.  But that is not a defense to a conspiracy charge.  The First Circuit dealt with an analogous issue in *United States v. Anello*, 765 F.2d 253, 262 (1st Cir. 1985).  The issue was whether there was an agreement to purchase marijuana when the defendant conditioned

the purchase on the quality of the drug.  Ultimately, the purchase was never consummated.  In

affirming the conspiracy conviction, Judge (now Justice) Breyer noted:

> These facts are sufficient, in our view, to warrant the jury's finding that Root
> agreed to purchase marijuana.  . . .  The evidence recited would allow the jury to
> find that he at least agreed conditionally to "purchase the marijuana with an intent
> to distribute it"--*i.e.*, he agreed to buy it if the quality was adequate. But
> agreement to buy that is conditional is nonetheless for conspiracy purposes an
> agreement to buy, at least as long as the potential buyer believes the condition
> likely to be fulfilled. *See United States v. Feola*, 420 U.S. 671 [(1975)](conspiracy
> to assault even though conspirators agreed to assault only if their efforts to
> swindle the victims failed); *United States v. Grassi*, 616 F.2d 1295, 1302 (5th Cir.
> 1980) ("It is true that the [marijuana] importation was to occur only if [the
> defendants] became satisfied that they were not dealing with police, but such a
> proviso is like any condition in an agreement. That the agreement was subject to a
> condition does not make it any less an agreement.").

*United States v. Anello*, 765 F.2d at 262-263.  Once Raymond told Tobin that it was possible to

accomplish the scheme, Tobin surely could reasonably foresee that it was likely to be brought to

conclusion.

## II.    TOBIN ENTERED INTO THE CONSPIRACY TO MAKE THE TARGET PHONES RING REPEATEDLY AND CONTINUOUSLY

Tobin asserts, correctly, that the evidence must show that the conspirators had "the degree

of criminal intent necessary for the substantive offense itself."  *Ingram v. United States*, 360 U.S.

672, 678 (1959).  He fails to apprehend that the evidence was sufficient to show that, in broad

outline, the conspiracy contemplated having the target phones repeatedly and continuously ring.

McGee told Tobin that the plan involved disrupting phone lines by making telephone calls

(12/6/05 Tr. 87).  This was why McGee needed the name of a telephone vendor – "[p]eople who

make calls for whatever reason" (12/7/05 AM Tr. 53).  McGee could have decided to disrupt the

Democrats in a host of other ways: sabotaging their vehicles, bomb threats to their offices,  and

5

so on.  But *those* are not the scheme he described to Tobin – what he described to Tobin involved repeated phone calling.

Tobin and Raymond likewise discussed a scenario involving repeated phone calls, albeit repeated calls by a machine rather than human beings in Idaho.  Specifically, Raymond cited "an example of inadvertent phone jamming . . . ."  12/7/05 AM Tr. at 86.  While it is true that there remained details to be worked out, the essential nature of the scheme was agreed upon from the beginning among Tobin, McGee and Raymond.


**III.   THE EVIDENCE SUPPORTS THE JURY'S FINDING THAT TOBIN WAS A MEMBER OF A CONSPIRACY TO COMMIT TELEPHONE HARASSMENT.**

_____A Rule 29 motion must be denied if the Court concludes that, "after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994).   The evidence introduced at trial sufficiently permitted the jury to find that Tobin agreed with McGee and/or Raymond to participate in a conspiracy to use the telephone lines to harass the Democratic Party and its workers on Election Day 2002.  As set forth above, McGee presented to Tobin the key details of his phone jamming plan:  using a telemarketing company to place multiple calls on Election Day to numbers affiliated with the Democratic Party, for the purpose of disrupting the Democrats on Election Day.  (Tr. 12/6/05 pm at.87-88; Tr. 12/7/05 am at 53-54.)  After hearing the details of the plan, Tobin agreed to help McGee with this plan by providing McGee with the contact information of someone who could "help"

McGee. (Tr. 12/6/05 pm at 88.)  Then, Tobin also placed a call to that individual – Allen

Raymond – to discuss the plan.  (Tr. 12/7/05 am at 85-86.)  In that conversation with Raymond,

Tobin told Raymond all of the details of the plan, and asked Raymond if he could help. *Id.* at 86-

87.  Raymond said yes.  *Id.*  It was this plan – the plan to jam the phone lines affiliated with the

Democratic Party on Election Day 2002 – that was ultimately implemented as a result of the

conspiracy.

　　　Tobin's Rule 29 challenge, however, is predicated on his argument that no conspiracy

existed between Tobin and either McGee or Raymond because, subsequent to Tobin's

involvement, McGee and Raymond consulted others – including attorneys – about the phone

jamming plan.  *See* Rule 29 Br. at 16-19.  Of course, it is axiomatic that a co-conspirator need

not know all essential details at the time of his agreement.  *See* United States v. O'Campo, 973

F.2d 1015, 1019 (1st Cir.1992) (holding that "the government need not establish that the

[members] knew or agreed upon every detail of the conspiracy," but only "the essential nature of

the plan and their connections with it" (citation and internal quotation marks omitted)); *United

States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987) ("[A] conspiracy is like a train. When a party

knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the

existing freight-or conduct-regardless of whether he is aware of just what it is composed.").

Here, the evidence presented to the jury was that McGee presented a plan that he wanted to

achieve, that Tobin not only agreed to assist McGee in that plan but also conveyed the same key

details of that plan to Raymond, and that Raymond told Tobin that he could achieve such a plan.

That subsequent steps and subsequent details occurred during the implementation of the scheme

is of no legal moment.[1]

Finally, Tobin's argument for a judgment of acquittal appears to be that Tobin could not have conspired with either McGee or Raymond because, at the time Tobin spoke with them, each of them had not yet consulted with an attorney.  Of course, this argument conveniently omits the fact that, at closing, Tobin's attorneys argued to the jury that Raymond never consulted with a lawyer, and that Raymond lied to McGee and to the jury about having consulted with a lawyer. *See* 12/12/05 pm at 16 ("Mr. Raymond . . . just happens to be making up the fact that he checked with a lawyer").[2]  Indeed, in a post-trial colloquy with the Court, Tobin's attorneys quite specifically argued that the evidence at trial showed that Raymond had in fact not consulted with an attorney:

> COURT:     And maybe I misunderstood your closing.  Seemed to me you were saying that when Mr. Raymond said he consulted counsel, he lied.
>
> D.B.:      That's right.  That he lied to Mr. McGee, too.
>
> COURT:     So he did consult with counsel in your view or didn't?

---

[1] Furthermore, to the extent that Tobin's argument here is that no conspiracy existed until certain subsequent conditions were satisfied, the government notes that the First Circuit, along with other circuits, has rejected the legal basis for such an argument.  *See, e.g., United States v. Palmer*, 203 F.3d 55, 64 (1st Cir. 2000); *United States v. Anello*, 765 F.2d 253, 262 (1st Cir. 1985) ("agreement to buy that is conditional is nonetheless for conspiracy purposes an agreement to buy, at least as long as the potential buyer believes the condition likely to be fulfilled"); *United States v. Podolsky*, 798 F.2d 177, 178 (7th Cir. 1986) ("conditions, express or implied, do not make a contract unenforceable; they merely define the circumstances in which a party can avoid having to perform his contractual obligation; they presuppose rather than nullify the obligation")

[2] In fact, Tobin's use of this during closing prompted a colloquy between the Court and Tobin's counsel after the jury retired for deliberations.

D.B.:          No, I don't think he did.

12/12/05 pm at 96-97.

When Tobin argued to the Court and, more importantly, to the jury that Raymond never consulted with an attorney after speaking with Tobin, Tobin's post-trial arguments that the jury verdict should be vacated <u>because</u> of Raymond's consultations with an attorney after speaking with Tobin are simply of no merit. Tobin's arguments on this point are insufficient to overturn the jury's verdict on Count 2 of the Superseding Indictment.

## IV.    THE EVIDENCE WAS SUFFICIENT TO SUSTAIN TOBIN'S CONVICTIONS FOR CONSPIRACY AND AIDING AND ABETTING

Contrary to Tobin's arguments, his participation in the scheme to jam Democratic phone lines in 2002 more than adequately supports the convictions for conspiracy to commit and aiding and abetting interstate telephone harassment.  In contrast to the cases he cites, Tobin was the "catalyst" for the phone jamming scheme.  *See e.g.*, *United States v. Winston,* 687 F.2d 832, 834-36 (6th Cir. 1982) ("Appellant was the catalyst who put this transaction together.").  Without Tobin's actions, both his co-conspirators, Charles McGee and Allen Raymond, testified that they would not have gone forward with the phone jamming plan.  In fact, neither McGee nor Raymond knew each other prior to Tobin's involvement.  12/6/05 Tr. 89:13-21; 12/7/05 AM Tr. 87:11-16

Mr. McGee testified that he asked Tobin for help with the phone jamming scheme because he could not locate any telephone vendors who were willing to implement his plan.  12/6/05 Tr. at 85:2 to 87:5.  In a last ditch effort to find a way to make the phone jamming scheme happen, McGee turned to Tobin right before the election.  12/6/05 Tr. at 86:16 to 87:5.

Tobin is an experienced, high ranking political operative who was the New England Regional Director of the Republican National Committee and the National Republican Senatorial Committee during the 2002 election cycle.  12/6/05 Tr. at 81:2-6; *see also* 12/7/05 AM Tr. at 66:6 to 69:5.  Although a scheme to jam Democratic phone lines was obviously "underhanded," Tobin did not tell McGee to stop his plan.  12/7/05 AM Tr. 52:20 to 54:21.  If Tobin had told McGee to stop, McGee testified that he would have.  *Id.* at 60:17-24.  Instead, McGee testified that Tobin affirmatively assisted him by giving him the name and number of Allen Raymond and telling him that Raymond can "help him."  12/6/05 Tr.  at 87:24 to 88:5; 12/7/05 AM Tr. 54:15-21.

Then, Tobin took the next step in furthering the phone jamming scheme by calling Raymond to make sure he would help McGee.  Specifically, Raymond testified Tobin called and asked him if Raymond could implement a plan to jam or disrupt Democratic party and affiliated Democratic organizations' efforts to Get-Out-The-Vote on Election Day.  12/7/05 AM Tr. at 85:17 to 86:14.  Raymond responded that it could be done and gave as an example of how phone lines has been inadvertently jammed by a large volume of telephone calls being made through one switch.  *Id.* at 86:18-22.  Raymond testified that "my point there is that if it can done inadvertently, it can be done intentionally, and then I tell him [Tobin] that we can do it, that anything is possible."  *Id.* at 86:22-87:2.  Tobin then tells Raymond to "wait for a call from the executive director of the New Hampshire State Republican Party."  *Id.* at 87:1-5.

McGee subsequently called Raymond and they worked out the details to implement the phone jamming scheme.  12/6/05 Tr. at 89:3 to 98:5; 12/7/05 AM Tr. 89:5 to 98:6.  Tobin, however, is not out of the picture.  Telephone records show a number of calls between Tobin, the

10

New Hampshire Republican State Committee where McGee works and Raymond on the day before and the day of the elections. Tr. Exs. 52, 53.  In particular, when the phone jamming scheme gets stopped on Election Day after approximately 2 hours of calls, Raymond reaches out repeatedly to Tobin to discuss the issue.  *Id.; see also* 12/7/05 AM Tr. 103:13 to 104:11, 105:22 to 106:18, 107:8 to 109:2.  As the evidence shows, Tobin was at the center of this scheme.  In fact, Raymond testified that if McGee had called him "out of the blue" about this phone jamming scheme, Raymond would not have done it.  12/7/05 AM Tr. 129:18-24.

Tobin's stake in the phone jamming scheme is obvious.  His job as the New England Regional Director of the Republican National Committee and the National Republican Senatorial Committee ("NRSC") was to get Republican candidates elected in 2002, particularly Senatorial candidates.  Raymond, who has also been a field representative for the NRSC in prior elections, testified that the purpose of the NRSC was to "[w]ork[] with campaigns and state parties around the election of the U.S. Senate candidates." 12/7/05 AM Tr. at 70:23 to 71:2.  More significantly, there was a hotly contested Senate race between the Republican and Democratic candidates and one of the main goals of the Republican Party was to retain the Senate seat.  Tr. Exs. 1, 22, 23, 24.

While Tobin argues that his involvement was minimal, even "a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy."  *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir. 1978); *see also United States v. Riveria-Ruiz,* 244 F.3d 263, 270 (1st Cir. 2001); *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995); *United States v. Barlin*, 686 F.2d 81, 90-91 (2d Cir. 1982).  Here, there is no question that Tobin's actions were intended to advance the phone jamming scheme.  Tobin

first told McGee to call Raymond for help and then personally called Raymond to explain the

scope of the phone jamming plan and make sure Raymond will work with McGee.  Once Tobin

completed his call to Raymond, the conspiracy had occurred.  Unlike the defendant in *United*

*States v. Andujar*, 49 F.3d, 16, 22 (1st Cir. 1995), who was unaware of the criminal scheme,

Tobin knew the essential nature of the plan, jamming Democratic affiliated phone lines on

election day with repeated calls, and got Raymond to agree to help implement the plan.  *See*

*United States v. Sanchez*, 917 F.2d 607, 610 (1st Cir. 1990) ("The government need not establish

the defendants knew or agreed upon every detail of the conspiracy.  All that is required is to show

the essential nature of the plan and their connections to it.") (internal quotations and citation

omitted).  Tobin also had a stake in the success in phone jamming scheme.  Unlike the defendant

in *United States v. Aponte-Suarez*, 905 F.2d 483, 491 (1st Cir. 1990), Tobin was far from

indifferent about the success of the phone jamming scheme as it was his job was to get

Republicans, especially Senate candidates, elected in New Hampshire.[3]

Tobin's followup call to Raymond also provides ample evidence of aiding and abetting.

When Tobin explained the phone jamming scheme to Raymond, it showed that Tobin shared

McGee's knowledge of the underlying crime.  And when Tobin asked Raymond to help

implement the plan, it showed that Tobin associated himself with the plan, participated in its

implementation, and wanted it to succeed.  *See, e.g.,United States v. Montilla-Riveria*, 115 F.3d

1060, 1064 (1st Cir. 1997) ("To convict Montilla of aiding and abetting, the government had to

---

[3] Also contrast Tobin's motive to that of defendants in *Robinson v. United States*, 262 F.2d 645, 649, 651 (9th Cir. 1959) (emphasizing that government did not prove defendant had stake in commission of crime); *Morei v. United States*, 127 F.2d 827, 831 (6th Cir. 1942) (noting "it is not claimed . . . [defendant] expected to receive anything from the claimed transaction").

prove that his codefendants committed the crime, and that Montilla associated himself with, and participated in the drug transaction as something he wished to bring about, and sought by his actions to make it succeed.").  Further, "[i]t is well settled that a culpable aider and abetter need not perform the substantive offense, be present when it is performed, or be *aware of the details of its execution*."  *United States v. Colon-Munoz*, 192 F.3d 210, 223 (1st Cir. 1999) (emphasis added).  Thus, the fact that Tobin did not participate in the discussions between McGee and Raymond finalizing the details to implement the phone jamming scheme does not relieve Tobin of liability for aiding and abetting.

Because the evidence, when viewed in the light most favorable to the Government, supports Tobin's convictions for conspiracy to commit and aiding and abetting interstate telephone harassment, Tobin's motion for judgment of acquittal should be denied.

## V.    INTENT TO INSTILL FEAR OR FRIGHTEN IS NOT AN ELEMENT OF THE CHARGED OFFENSES

As discussed in our response to Tobin's Motion for a New Trial, intent to instill "fear" or "frighten" is not an element of 47 U.S.C. § 223(a)(1)(D).  There was therefore no basis for the Court to so instruct the jury.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Tobin's motion

be denied.

Dated:  February 10, 2006


By:    /s/ Andrew Levchuk
ANDREW LEVCHUK
LILY N. CHINN
United States Department of Justice
Computer Crime & Intellectual Property Section
(202) 353-3622

NICHOLAS A. MARSH
United States Department of Justice
Public Integrity Section
(202) 305-7747

14

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of February, 2006, the Government's Objection to Defendant's Motion to for a Judgment of Acquittal was filed with the Court through the ECF system and that service will be made electronically on this day to Counsel for Defendant, including Dennis M. Black of Williams & Connolly LLP, and Brian T. Tucker of Rath, Young and Pignatelli.

 /s/ Andrew Levchuk
Andrew Levchuk

15