THE STATE OF NEW HAMPSHIRE

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES, Plaintiff | \* | |
| | \* | |
| V. | \* | 4-CR-216-SM |
| | \* | |
| JAMES TOBIN, Defendant | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VICTIM SENTENCING MEMORANDUM

COMES NOW, the New Hampshire Democratic Party, the named victim in the indictments *sub judice*, by and through counsel, Paul Twomey, and submits the following sentencing memorandum in the above captioned case. In addition, the Victim requests that its Chair, Kathy Sullivan, be allowed to address the Court before imposition of sentencing.

# **DEFENDANT TOBIN SHOULD BE SENTENCED TO THE MAXIMUM TERM OF IMPRISONMENT, THE MAXIMUM FINE AND FULL RESTITUTION**

> "No right is more precious in a free country than that of having a vote in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined ...Competition and ideas in governmental policies is as the core of our electoral process and in the First Amendment freedom.  (Justice Hugo Black, <u>Williams v. Rhodes</u>, 393 US 23, 30-31 (1968).

On November 4, 2002, over 2,000 volunteers and staff of the New Hampshire Democratic Party went to sleep with the hope and expectation that the next day they would take part in a fair and free election in which they would be allowed an equal chance to present the citizens of the state of New Hampshire with their policies and candidates for consideration.  They expected to exercise their precious constitutional rights to vote, to freedom of association and to freedom of speech without interference or constraint.  The staff and volunteers had spent thousands of hours preparing for the day when they thought they would partake in a fair and equal election. The New Hampshire Democratic Party and its candidates had spent in excess of 20 million dollars in order to present their positions to the electorate.  (The Republicans spent a similar amount).  Given the closeness of the polling results, both parties recognized that the key to success would lie in their ability to identify sympathetic voters and ensure that those voters went to the polls.

Both parties instituted massive "Get out the Vote" (GOTV) efforts which depended entirely upon the ability to communicate between the workers and volunteers at the polls, the campaign headquarters, and portions of the campaign set up to encourage voting, such as phone banks and rides to the polls programs.  At each polling

place in New Hampshire, the major parties are allowed by law to have observers present at the check in points so as to monitor who has voted.  The observers crosscheck those who have voted off of a list of persons previously identified as likely supporters and communicate the results to the headquarters, enabling the party to determine which supporters haven't voted and direct efforts towards them to encourage them to vote.  In addition, the Democratic Party and the Professional Firefighters Union provided phone numbers that the elderly and infirm could call for rides to the polls so that they might join their fellow citizens in self-governance.

In their lust for power, James Tobin and his criminal confederates determined that they would not leave the outcome to the free and unimpeded choice of citizens in a fair election.  Fearing that a fair election might result in the people choosing candidates of another party, Tobin and McGee devised a pernicious scheme to hinder Democratic communications and thwart the party's GOTV program, making it impossible for the Democratic Party, its staff, and its thousands of volunteers to effectively communicate.

Treating its civil political opponents in a manner appropriate to enemy combatants, Tobin and McGee chose to use military tactics learned by McGee in the Marine Corps in order to cheat in an American election.  (In a bulletin issued on April 13, 2006, the Department of Homeland Security described the jamming of phone lines in order to block legitimate calls as a radical tactic used by extremists and terrorists).

They then organized a far-reaching conspiracy involving many people and significant resources to cripple the constitutionally protected communications of their fellow citizens.  This conspiracy involved numerous Republican officials, including the state Republican Party Chairman, John Dowd, the Republican state party's Executive Director, Chuck McGee, the New England Political Director of the Republican National

Committee (Tobin), the Director of the Republican Leadership Council (Raymond), and Republican telemarketing companies in Virginia and Idaho (GOP Marketplace and Mylo Enterprises).

In addition, serious questions still remain as to whether additional persons were party to this criminal conspiracy--McGee testified that several individuals including at least one from an organization that later "hired" James Tobin had advance knowledge of the conspiracy. He further testified that a prominent lobbyist expressed knowledge of the conspiracy and a willingness to assist it. Substantial questions are similarly raised by the willingness of the Republican National Committee to pay what has been reported as close to three million dollars for the defense of Mr. Tobin and the reported large number of calls from Tobin to the Political Office of the White House during the crime. Tobin's refusal to accept responsibility and cooperate in the investigation has deprived the people of the state and country of knowledge of who was involved. Without full public knowledge, those still at large remain able to further subvert democracy. It is instructive to note that in the two years that separated the crime from Tobin's indictment, he remained in high-level positions (i.e., one of eight regional directors of Bush/Cheney 04) where he could continue to prey on the American voters.

As a direct result of Tobin's crimes and his refusal to accept responsibility, democracy itself has suffered a grievous blow. These actions took place in a context of extreme danger to American democracy both internally and abroad. By causing large numbers of citizens to question the fairness of elections, Tobin and his fellow criminals have weakened the underpinnings of our civic life at a time when we can least afford it.

The victims of Tobin's crimes are thus myriad and ubiquitous. They begin with the volunteer citizens who gave up their time to participate in democracy by standing at

polling places—volunteers whose day was wasted and whose faith in elections has been shattered.  The victims extend to the many young staffers manning the phones at the headquarters who were literally reduced to tears when their months of hard work were trashed by Tobin.  The victims extend to the weakest and most vulnerable, the elderly and infirm, who merely wanted to express their views and beliefs in a free election, but were denied transportation by an evil scheme designed by Tobin and McGee and their cohorts.  Particularly victimized were candidates in close elections, such as Peter McDonough, whose twenty-year career in the Hillsborough County Attorneys Office ended by the tiniest of margins, 122 votes out of 118,418, and the three candidates for State Representative who each lost by under 10 votes.  Each of these had their right to seek office in a fair and equal election, which is implicit in the Due Process Clause of the Federal Constitution and explicit in Part One, Article 11 of the New Hampshire Constitution.

Both Democratic candidate Jeanne Shaheen and Republican candidate John Sununu were also victimized to a great extent—Shaheen by being denied the right to take part in a fair election and Sununu, whose victory will be forever tarnished in the public mind.  Also victimized were the many decent Republicans who are repulsed by Tobin's cheating, yet find themselves part of a political party demoralized by both this crime and the ongoing cover-up.

The greatest victim of Tobin's criminality ultimately is society as a whole, as his acts have jeopardized the public's confidence in the electoral process and have instilled doubt in voters as to whether they live in a society which fiercely protects and defends the sanctity of free and fair elections.

The Democratic Party has not been vindictive to any degree in this case. When both Alan Raymond and Chuck McGee appeared for sentencing, Democrats asked that they not be incarcerated at all due to their acceptance of responsibility, their apologies and their willingness to provide the government with substantial assistance in fully exposing this matter so that the public could be protected from further depredations of those responsible.

James Tobin has chosen a different course and must accept the consequences. He has chosen to deny responsibility and has refused to either accept responsibility or to assist the government in holding others responsible. In doing so, he has chosen to inflict pain upon his family and his country. (The cynical use of references to Tobin's children, family and friends in the defense opening statement at his trial was never supported by any evidence whatsoever and was a patently improper attempt to influence the jury. It is likely that this attempt will be repeated at sentencing. While the Democratic Party is not unmindful of the pain this conviction has placed upon Mr. Tobin's family, and indeed is sympathetic to them, it must be remembered that it is Tobin himself who has inflicted the pain—first by committing the crime and then by refusing to accept responsibility. If anything, the affect of these crimes on Tobin's family should be viewed as an aggravating factor).

Given the severity of the offense, the large number of victims, the denial of responsibility and the refusal to aid in protecting the public from future crimes, James Tobin should be sentenced to the maximum term of imprisonment allowed by law. In addition, he should be fined the maximum amount allowed by law and ordered to pay full restitution to the Democratic Party for all costs of the Get Out the Vote Effort in the 2002 election.

# ADJUSTMENTS, UPWARD EHANCEMENTS UNDER THE SENTENCING GUIDELINES

The Sentencing Guidelines normally associated with the crimes of Tobin envision a crime with a single victim without any of the severe damage caused by Tobin both to large numbers of people and to society in general. Accordingly, the guidelines grossly understate the seriousness of the offense and provide no meaningful guidance as to an appropriate sentence.

The following are areas which should be considered as aggravating factors under both the Sentencing Guide and pursuant to general sentencing considerations.

A. **§ 3A 1.2 (a). Official Victim**. Under New Hampshire Revised Statute Annotated 666:4, in each voting precinct, New Hampshire State law authorizes the appointment of a challenger by either of the major political parties in the State. These challenges are given official function and authorized to be placed in such a place so they are able to see and hear each voter as they are voting. Under New Hampshire law they may engage in challenges of voters. They are normally utilized to maintain communications between central headquarters of the party and the individual precinct so that the campaign headquarters are able to receive information as to who has voted and direct their Get Out the Vote efforts at those who have not voted. The importance of this function is recognized in the Get Out the Vote plans for both parties in 2002. Virtually all of the challengers appointed by the Democratic Party were volunteers who had taken the day off of their normal family and work obligations in order perform this important public function. Each one of these individuals had their efforts totally

reduced to meaningless by the actions of James Tobin and his criminal cohorts.  By eliminating the ability of these official challengers authorized by law, Tobin and his co-conspirators made it impossible to perform their public function, thereby meriting a free level increase under § 3.3 A 1.2 (a).

## § 3B.1  AGGRAVATING ROLE

Mr. Tobin was an organizer or leader of a criminal activity that involved five or more participants and was otherwise extensive thus requiring an increase of four levels in the applicable guideline range.  This conspiracy was hatched in a conversation Mr. Tobin had with Mr. McGee.  Mr. Tobin was the Regional Director of the Republican National Committee and someone to whom Mr. McGee answered.  Mr. McGee testified that if Mr. Tobin had told him not to do this he would have obeyed his instructions from Mr. Tobin.  Likewise, Mr. Raymond indicated that his participation in this event was solely due to the fact that he was requested to do so by Mr. Tobin.  In addition to McGee and Tobin, John Dowd, Chairman of the New Hampshire Republican Party engaged in a conspiracy and according to the testimony of McGee authorized the phone jamming.  Chris Cupit, of GOP Marketplace, undertook activities to which Tobin had directed Raymond to carry out.  Cupit in turn engaged and supervised the activities of Sean Hanson and other employees of Milo Enterprises.  Chuck McGee's testimony indicated that John Dowd, Chairman of the New Hampshire Republican Party took part in the conspiracy and authorized it to go forward on the night of November 4th, 2002.  McGee further testified that an individual named Daryl Henry had taken part in conversations that formed a part of the conspiracy and that he indicated that his group would continue the efforts after Milo had withdrawn.  All these individuals were participants in this

conspiracy. Furthermore, the criminal activity was extremely extensive involving efforts in at least three separate states that sought to place hundreds if not thousands of phone calls to phone lines in six separate locations. All of the above merits Mr. Tobin a four level increase.

### §3 B 1.1 ABUSE OF TRUST OR USE OF SPECIAL SKILL

Mr. Tobin occupied a position of both private and public trust as New England Political Director of the Republican National Committee. He was extremely familiar with the nature of political campaigning and thus in a unique position to conspire with McGee in order to maximize the disruption to the communications of the victim on Election Day. Because he had extensive knowledge of individuals and resources involved in campaigning, he was able to direct McGee immediately to an individual, Alan Raymond, who had the ability and propensity to engage in the criminal activities necessary. As such Tobin used a special skill that was unavailable to others including McGee who had been unable to find someone willing to commit this heinous offense. Accordingly, there was an abuse of trust and use of a special skill which requires a two level increase. Because Tobin was in a position of trust that he abused, this adjustment is in addition to any adjustment under §3 B 1.1 Aggravating Role.

On March 22, 2004, the United States Sentencing Commission released the following: "Public corruption offenses are among the most harmful crimes against the system," said Commission Vice Chair Ruben Castillo. "At a time when the security of our borders is paramount, the Commission wanted to send the strong message to those officials responsible for the security of our borders that any selling of their office would result in serious penalties. We must have zero tolerance for these types of offenses."

Commissioner Castillo labeled public corruption offenses as crimes of "internal terrorism" that strike at the heart of our democratic government.

The criminal activity of Tobin and his accomplices represents an even greater threat to the nation than the personal or institutional venality inherent in public corruption cases. The Constitution and the laws of the United States provide this Court with the discretion and the responsibility to determine the appropriate sentence within the statutory range. As always, the maximum sentence should be reserved for the most egregious crimes, both to punish and to deter others from especially heinous behavior. This is such a case.

>Respectfully submitted,
>
>**NEW HAMPSHIRE DEMOCRATIC PARTY**
>
>By and through their Attorneys,
>
>   /s/Steven M. Gordon for Paul Twomey
>
>Paul Twomey
>Twomey Law Office
>4 Brimstone Hill Road
>Epsom, New Hampshire 03234
>(603) 736-5800

## CERTIFICATION

I HEREBY CERTIFY that a copy of the foregoing Victim Sentencing Memorandum has been forwarded and transmitted electronically this 11th day of May, 2006 to Andrew Levchuk, United States Attorney's Office, Brian Tucker, Esq., and Dane H. Butswinkas, Esq.

    /s/Steven M. Gordon for Paul Twomey
Paul Twomey